432 SUPREME COURT OF WISCONSIN. [Oct.

State ex rel. Umbreit v. Helms, 136 Wis. 432.

## State ex rel. Umbreit vs. Helms, Circuit Judge.

*September 14—October 20, 1908.*

*Supreme court: Superintending control of inferior courts: Quashing by trial court of criminal complaint: Review: Mandamus to compel trial.*

1. The power of this court to exercise its superintending control, under sec. 3, art. VII, Const., always exists when an inferior court either refuses to act within its jurisdiction or acts beyond its jurisdiction to the serious prejudice of the citizen and there is no other adequate remedy.

2. The fact that it becomes necessary to review judicial action of an inferior court is not an insuperable obstacle to the exercise of the power of superintending control in a proper case.

3. With respect to the superintending control of trial courts in criminal actions, any question arising by objection to the proceeding before the jury is impaneled and sworn is a preliminary question.

4. Any erroneous disposition of a criminal case before a jury is impaneled and sworn by which the court below refuses to proceed further with the trial upon a valid complaint, indictment, or information, where it appears that the duty of that court was plain, the result of the refusal prejudicial, and the remedy by writ of error or appeal utterly inadequate, is sufficient to arouse the jurisdiction of this court under its power of superintending control.

5. Thus, where the circuit court, before entering upon the trial, quashes a valid complaint, indictment, or information charging a criminal offense and discharges the accused, this court, in the absence of other adequate remedy, may, under its power of superintending control, by appropriate writ, require the inferior court to proceed within its jurisdiction and try the accused.

6. The power of superintending control will not be exercised upon light occasion or when other and ordinary remedies are sufficient, but only when the exigency is of such an extreme nature as obviously to justify and demand the interposition of that extraordinary power.

7. The quashing by the circuit court of a complaint charging a person with practicing medicine without having a license or certificate of registration as required by law, is *held* not to create an exigency calling for the exercise of this court's power of superintending control.

State ex rel. Umbreit v. Helms, 136 Wis. 432.

*Per* MARSHALL, J.:

1. The "general superintending control over all inferior courts," granted to the supreme court in sec. 3, art. VII, Const., is not limited other than by the necessities of justice. It extends to judicial as well as to jurisdictional errors.

2. The necessities of justice, in a legal sense, do not reach beyond the scope of governmental policy as to righting wrongs by judicial interference; as for example, it stops in criminal cases at the constitutional prohibition of a second jeopardy.

3. The grant of superintending control, though without specified means or instrumentalities for its exercise, includes by necessary implication all common-law writs and means applicable thereto and all power necessary to make such writs and means fully adaptable for the purpose.

4. The extent of the power of superintending control, as to any particular group of circumstances, is not measurable by that of the common-law writ most adaptable in its ordinary scope to vitalize such power in regard to such circumstances. Such extent is referable to the necessities of the case, and the ordinary-use feature of the writ is to be expanded to meet the exigencies thereof.

5. The common-law writs with the power indicated to adapt them leave no part of the court's superintending control power to be necessarily dormant for want of means to vitalize it.

6. The existence of error in the field of the controlling power does not, necessarily, upon proper request in form, require the doors of the jurisdiction to open. When that should occur rests in sound judicial discretion.

7. By the policy of this court its superintending control power is to be exercised only when the right of the matter involved is plain, there is no other efficient remedy for its invasion or denial, such invasion or denial is prejudicial, and, generally, and especially as to errors not strictly jurisdictional, the case presents circumstances of exceptional or extraordinary hardship.

WINSLOW, C. J., assents to the holding that in a proper case this court will not only review by *mandamus* the action of an inferior court in dismissing a case upon a preliminary question without trial, but will review any ruling which results in the practical throwing of a case out of court before trial upon the evidence—this meaning, as applied to criminal cases, any ruling resulting in dismissal prior to the impaneling of a jury and the placing of the defendant in jeopardy. He also agrees with the conclusion that this case is not of sufficient importance to move this court to action.

Dodge, J., concurring in the judgment, is of the opinion that the power of superintending control conferred on this court by the constitution is coterminous with the power vested in the court of King's Bench; that it extends to a review of decisions on preliminary questions needing to be decided before the trial court can take into consideration the merits of a controversy, but does not extend to a review of a decision that the facts stated in a criminal complaint constitute no offense—that not being the decision of a preliminary question but a decision of the merits upon an issue of law.

Mandamus to Eugene W. Helms, Judge of the Circuit Court for St. Croix County. *Peremptory writ denied.*

Application on the part of the state, through the relator, was made to this court, praying that it exercise its power of superintending control over inferior courts by directing Hon. E. W. Helms, respondent herein and judge presiding of the circuit court for St. Croix county, to set aside an order made by him quashing and dismissing a criminal complaint against one John Till in a criminal action pending in the circuit court for said county against said Till, and to direct said court to reinstate said action and proceed with the trial thereof. This proceeding was commenced upon petition by the relator as attorney for the Wisconsin Board of Medical Examiners, and upon consent granted of the district attorney for St. Croix county and the attorney general of the state of Wisconsin. An alternative writ of *mandamus* was issued out of this court directed to the respondent and served. Due return was made to the writ, admitting substantially the allegations of the petition.

It appears from the admitted facts that on the 24th day of February, 1908, a complaint was made to a justice of the peace of St. Croix county against said John Till upon the charge of wrongfully and unlawfully practicing medicine in this state. The complaint charged:

That "John Till did on the 16th day of December, A. D. 1907, at said county, wrongfully and unlawfully practice medicine, by then and there prescribing, for a fee and for compensation, drugs, medicines, and other medical treatment

to and for one John A. Larson, for the cure and relief of wounds, fractures, bodily injuries, infirmities, and diseases of him, the said John A. Larson, without him, the said John Till, having then and there and theretofore obtained from the Wisconsin State Board of Medical Examiners a license to practice as a physician or surgeon in said state as provided and required by the provisions of chapter 426 of the Laws of Wisconsin for the year A. D. 1903, and acts amendatory thereof, and without then and there having a certificate of registration issued to him, the said John Till, pursuant to the provisions of chapter 87 of the Laws of Wisconsin for the year 1899, and the said John Till not being then or there a dentist or resident refracting optician engaged in the practice of such profession. . . ."

Upon this complaint a warrant was issued and said John Till brought before the justice, tried, and found guilty as charged in the complaint, and sentenced to pay a fine of $100 and costs and to imprisonment in the county jail for a period of three months. From this judgment Till appealed to the circuit court for St. Croix county. The action was placed on the regular calendar, and on the first day of the term, before any jury was impaneled in the case, said defendant, by his attorney, moved the court to quash the complaint and for discharge, for the reason that the complaint did not state facts sufficient to constitute an offense under the laws of Wisconsin. The motion was granted and the court refused to further proceed with the action.

For the relator there was a brief signed by *A. C. Umbreit in pro. per.* as attorney for the Wisconsin State Board of Medical Examiners and by the *Attorney General,* and oral argument by *Mr. Umbreit.*

For the respondent the cause was submitted on the brief of *W. F. M'Nally.*

The following opinion was filed October 20, 1908:

KERWIN, J. The important question presented by the record is whether this court, under its power of superintending control over inferior courts granted to it by sec. 3,

art. VII, Const., has power to review and control the action and determination of the circuit court in respect to the matter complained of.    Sec. 3, art. VII, Const., provides:

"The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by jury be allowed. The supreme court shall have a general superintending control over all inferior courts; it shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari* and other original and remedial writs, and to hear and determine the same."

This court has had occasion to pass upon this provision of the constitution at an early day in *Att'y Gen. v. Blossom,* 1 Wis. 317, and many times since.    The general scope of the subject has been quite fully covered in former decisions of this court.    *Att'y Gen. v. Blossom,* 1 Wis. 317; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081; *State ex rel. Mitchell v. Johnson,* 105 Wis. 90, 80 N. W. 1104; *State ex rel. Fourth Nat. Bank v. Johnson,* 105 Wis. 164, 83 N. W. 320; *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 82 N. W. 158; *State ex rel. W. G. Taylor Co. v. Elliott,* 108 Wis. 163, 84 N. W. 149; *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *In re Gates,* 117 Wis. 445, 94 N. W. 292; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500.    In view of what has been said in the above cases, we do not feel that any extended discussion of the history and scope of the doctrine of superintending control under our constitution is necessary.    Moreover, we think the case before us is embraced within narrow limits, and the determination of it we regard sufficient without laying down rules for the government of future cases which may arise and require the discussion of legal principles not necessary to be considered here.    The words of the constitution granting to this court

the power of superintending control over inferior courts are defined in *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081, and other cases heretofore cited. The question, therefore, arises in the instant case whether when the circuit court, before entering upon the trial, dismisses a criminal complaint, indictment, or information charging a criminal offense, and discharges the accused, this court has power under the authority conferred by the constitution to require by appropriate writ the inferior court to proceed within its jurisdiction and try the accused, where there is no other adequate remedy.

The high prerogative authority, though sparingly used, applies as well to criminal as to civil cases. *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 614, 79 N. W. 1081; *State ex rel. McGovern v. Williams, ante,* p. 1, 116 N. W. 225; *State ex rel. Harris v. Laughlin,* 75 Mo. 358; *Benners v. State,* 124 Ala. 97, 26 South. 942; 1 Bishop, New Crim. Proc. § 1402. In *State ex rel. McGovern v. Williams, supra,* the question presented was whether this court has jurisdiction, under its power of superintending control, to compel the circuit court to reinstate a criminal action and proceed to the trial thereof, where the indictment had been wrongfully quashed by the trial court before a jury was impaneled on the ground that the indictment was bad because the grand jury returning such indictment was illegally constituted. In that case this court held the question of whether the grand jury was an illegal grand jury, and therefore the indictment void, was a preliminary question, and that this court could order the trial court to reinstate the case and proceed with the trial of it. That case, we think, is the same in principle as the one now before us. Here the court below held the complaint bad for want of sufficient facts, and there because of illegality of grand jury. In each case, before entering upon the trial, the court passed upon the validity of the indictment, or, to be accurate, in the

one case the complaint and in the other the indictment, and
the question is whether an erroneous ruling that the indict-
ment or complaint is bad for want of sufficient facts can be
reviewed by this court in a proper case under its power of
superintending control.

It will be observed under the rule laid down in the cases
before cited, and especially in *State ex rel. Fourth Nat.
Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081, that power
always exists when an inferior court "either refuses to act
within its jurisdiction or acts beyond its jurisdiction to the
serious prejudice of the citizen" and there is no other ade-
quate remedy.   Does the quashing of a valid indictment
charging an offense known to the law and refusal to proceed
to the trial of the accused for the offense charged amount to
a refusal to act within its jurisdiction?   As we have seen,
this court held that it was where the ground upon which the
indictment was quashed involved a preliminary question,
namely, defect in impaneling the jury, and no other adequate
remedy existed (*State ex rel. McGovern v. Williams, ante,*
p. 1, 116 N. W. 225), and it was said:

"That the act of the circuit court is a refusal to exercise
its jurisdiction and perform its duty to consider the crimi-
nal charge against the accused seems too plain for discus-
sion."

So we come to the question before us, whether, in the ab-
sence of other adequate remedy, this court has power to com-
pel the trial court to assume jurisdiction of a criminal action
after it has quashed a good complaint upon the ground that
it did not charge an offense.   We see no difference in prin-
ciple between the two cases, hence we think the doctrine laid
down in *State ex rel. McGovern v. Williams, supra,* rules
this case.   The fact that it becomes necessary to review ju-
dicial action of an inferior court is no insuperable obstacle
to the exercise of the power of superintending control in a
proper case.   *State ex rel. Fourth Nat. Bank v. Johnson,*

103 Wis. 591, 623, 79 N. W. 1081; *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 234, 82 N. W. 158; *State ex rel. Winchell v. Circuit Court,* 116 Wis. 253, 93 N. W. 16; *State ex rel. McGovern v. Williams, supra.* True, the rule is laid down generally in the text-books and decisions of the courts to the effect that *mandamus* issued under the power of superintending control cannot be used to serve the purpose of a writ of error to review judicial action of the trial court. *State ex rel. McGovern v. Williams, supra;* High, Extr. Leg. Rem. (3d ed.) § 188; *State ex rel. Oshkosh, A. & B. W. R. Co. v. Burnell,* 104 Wis. 246, 80 N. W. 460; *State ex rel. Fourth Nat. Bank v. Johnson, supra.* But this general rule, like all others, is subject to its limitations, and it is only necessary to refer here to such as apply to the case before us. Others have been referred to in former decisions of this court where it is held that "this court is not universally restrained from reviewing acts done within the jurisdiction and judicial power of the inferior court in the exercise of superintending control." *State ex rel. McGovern v. Williams, supra; State ex rel. Fourth Nat. Bank v. Johnson, supra; State ex rel. Milwaukee v. Ludwig, supra; State ex rel. Winchell v. Circuit Court, supra.* A well-recognized exception to the general rule is the one laid down by this court in *State ex rel. McGovern v. Williams, supra,* respecting a preliminary question arising in a criminal action before entering upon the trial thereof. Mr. Justice DODGE, speaking for the court, said:

"The courts, English and American, agree with practical unanimity that such preliminary decision, however judicial in character, may be reviewed under the superintending power, and, in case of erroneous decision thereof by the inferior court, the latter should be required, by *mandamus,* to proceed to perform its duty toward the principal controversy notwithstanding its decision upon the preliminary question"—citing a long line of authority, English and American, in support of the proposition.

The cases do not appear to be in harmony as to what constitutes a preliminary question. *State ex rel. McGovern v. Williams, supra.* But we think the better authority and reason support the rule that a preliminary question respecting the control of trial courts in criminal actions arises upon any action of the court which amounts to a refusal to enter upon the trial of the case before a jury is duly impaneled and sworn to try the accused. So that any question arising by objection to the proceeding before the jury is impaneled and sworn is a preliminary question. *State ex rel. McGovern v. Williams, supra,* and cases cited in opinion; *Reg. v. Brown,* 7 E. & B. 757. Indeed, it is not important whether we call the question upon which the court passes and thus assumes to dispose of the case, and refuses to proceed within its jurisdiction, a preliminary question or not. Any erroneous disposition of a criminal case before a jury is impaneled and sworn by which the court refuses to further proceed with the trial upon a valid complaint, indictment, or information, where it appears "that the duty of the court below was plain, the refusal to perform such duty clear, the result of the refusal prejudicial, and the remedy by writ of error or appeal utterly inadequate," is sufficient to arouse the jurisdiction of this court under its power of superintending control. *State ex rel. McGovern v. Williams, ante,* p. 1, 116 N. W. 225, and cases cited; *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081; *State ex rel. Oshkosh, A. & B. W. R. Co. v. Burnell,* 104 Wis. 246, 80 N. W. 460; *State ex rel. Fourth Nat. Bank v. Johnson,* 105 Wis. 164, 83 N. W. 320; *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 82 N. W. 158; *Att'y Gen. v. Blossom,* 1 Wis. 317; *State ex rel. Mil. Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *State ex rel. Schutz v. Williams,* 127 Wis. 236, 238, 106 N. W. 286; *Reg. v. Brown,* 7 E. & B. 757; Merrill, Mandamus, § 203; *State ex rel. Harris v. Laughlin,* 75 Mo. 358; *State ex rel. New Orleans v. Judge,*

52 La. Ann. 1275, 27 South. 697; *Grand Rapids v. Braudy,* 105 Mich. 670, 64 N. W. 29; *Terrell v. Greene,* 88 Tex. 539, 31 S. W. 631; *State ex rel. Smith v. Smith,* 69 Ohio St. 196, 68 N. E. 1044; *Virginia v. Rives,* 100 U. S. 339; *In re Grossmayer,* 177 U. S. 48, 20 Sup. Ct. 535; *In re Connaway,* 178 U. S. 421, 20 Sup. Ct. 951; *State ex rel. Shannon v. Hunter,* 3 Wash. St. 92, 27 Pac. 1076; *Cassidy v. Young,* 92 Ky. 227, 17 S. W. 485; *McCreary v. Rogers,* 35 Ark. 298; *State ex rel. Keane v. Murphy,* 19 Nev. 89, 6 Pac. 840; *State ex rel. Bayha v. Philips,* 97 Mo. 331, 10 S. W. 855. We therefore conclude that this court has power in a proper case to compel the circuit court to proceed with the trial of a criminal case when it refuses to do so and wrongfully quashes the complaint, information, or indictment upon which the accused is brought to trial before a jury is impaneled and sworn.

2. The next question to be considered is whether an exigency exists for the exercise of the power prayed for in the petition. Assuming, without deciding, that the complaint states a criminal offense and therefore that the court erroneously quashed the complaint, we approach the question of whether a proper case is made calling for the exercise of the power of superintending control. This court has repeatedly held that it should not exercise its power of superintending control upon light occasions or when other and ordinary remedies are sufficient. *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081; *State ex rel. Meggett v. O'Neill,* 104 Wis. 227, 80 N. W. 447; *In re Mielke,* 120 Wis. 501, 98 N. W. 245; *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 87 N. W. 1107; *State ex rel. Mitchell v. Johnson,* 105 Wis. 90, 80 N. W. 1104; *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 82 N. W. 158. In *State ex rel. Tewalt v. Pollard, supra,* it is said:

"But this court will not exercise its jurisdiction when there is another adequate remedy by appeal or otherwise, nor

unless the exigency is of such an extreme nature as obviously to justify and demand the interposition of the extraordinary superintending power of the court of last resort of this state."

In view of the nature of the offense and the facility with which future prosecution may be maintained, should it be found necessary on the part of the state to do so, it is considered by this court that no such serious prejudice will result from the action of the trial court in quashing the complaint as to create an exigency calling for the exercise of the power of superintending control. It therefore follows that the writ should be denied.

*By the Court.*—The writ is denied.

The following opinion was filed October 20, 1908:

MARSHALL, J. (*concurring*). Desiring to aid, as best I can, in eradicating any misconception which may exist respecting the scope of the superintending power of this court over other courts and conditions under which such power should be exercised, I supplement the opinion written for the court, by stating in my own way its position as I understand it. The primary question is whether the controversy in this case is within the court's jurisdiction. The secondary question is whether a situation is presented of sufficient gravity to call such jurisdiction into activity. The power, as will be hereafter seen, is one and the all-important thing. In respect to that no discretion whatever exists. The secondary matter appeals solely to the judgment, the discretion, of this court.

While this opinion will be purely personal, its sole purpose is to reinforce what is well said by our Brother KERWIN in the court's opinion, so far as it goes, and to advance further, covering the entire subject, which in my judgment may now be legitimately considered, to the end that the right of the vexing questions which have so often engaged our attention

may some time be permanently set at rest.   That such is "a consummation devoutly to be wish'd" all will concur.   That it can be accomplished, I can only hope and give my best thought to that end.   The magnitude of the difficulties we have had to contend with can be best appreciated when it is understood that,—though we have some sixty years of judicial history behind us, and the important questions involved have many times challenged the attention of the court, and we have the help of all the light the learning of the justices of the past and present could shed upon them, and they were thought in the beginning to have been comprehensively solved in general terms and within the administration of some of the justices now in service to have been solved with particular definiteness,—we find ourselves in the instant case, as we have been at least twice before, quite recently, facing the same questions as still open for debate.   The picture thus presented is by no means overdrawn.   It appears still more strikingly in view of the fact that the highest court in each of many of the states has from time to time during the past half century dealt with the same or a similar subject, yet uncertainty seems to still exist.   If, as the fact seems to be, after all that has been written, the full scope of the highest power of this court, given in plain language, has not been heretofore defined with reasonable clearness, which I am not ready to admit, then no apology is necessary for this independent opinion even though, in view of the clearness with which the court has now spoken, its position seems quite clear as to the particular situation.

In discussing the matter I shall not endeavor to fence it about by precedents found in other jurisdictions, especially' by those of the English courts, but deal with principles, and holdings of this court, endeavoring to read therefrom substantial harmony in such holdings with the conception of the court's power entertained by the framers of the constitution, as at the outset here declared, and to show that it ex-

tended beyond mere correction of jurisdictional errors, to the very limits of the necessities of justice, except as barred by some constitutional mandate.

Much difficulty has arisen, it is thought, by regarding cases, especially those in foreign jurisdictions, which went upon the scope of some particular common-law writ specified in our constitution, as marking the limits of power, while the writs are mere conveniences for the exercise of a power existing independently of them. The false premise has at times naturally led to the idea, and given rise to judicial expressions, in terms or in effect, that the power of superintending control appertains only to such errors as may be in some reasonable view classed as jurisdictional. That, as we shall see, was not entertained here at the start, and, notwithstanding expressions from time to time in opinions, to which we shall refer, suggesting the contrary, has never been considerately adopted, if at all, and in recent years has been fully repudiated, though the extent to which judicial errors are subject to correction by use of the power has been left in doubt. Hence the situation we now face. By the last declaration on the subject (*State ex rel. McGovern v. Williams, ante,* p. 1, 116 N. W. 225), the power was, in effect, said to extend to all preliminary questions arising in the course of litigation though they involve correction of erroneous decisions within the inferior court's jurisdiction. No attempt was there made to define the limits of the term "preliminary questions," nor did the court go so far as to hold that its superintending power was limited to such questions. The decision was supported by copious citations of cases foreign and domestic, in the main at least, limited as to field of jurisdiction asserted, by the particular writ with which it was invoked; the general result being, that the wrong dealt with was within the field of the power because within the scope of the writ and jurisdictional in the sense, at least, of being an erroneous refusal to exercise jurisdiction. The case is in har-

mony with the refusal, by a divided court, of jurisdiction in *State ex rel. McGovern v. Williams,* 130 Wis. 588, 110 N. W. 1135, only in that, in the latter, the alleged error was in making an erroneous ruling in favor of the accused on a demurrer to the indictment, and in the former such an error in sustaining a plea in abatement, and some on the first occasion regarded the controversy as involving a judicial error, if error at all, in determining a question not preliminary, while others did not regard the subject of preliminary question material unless viewed so broadly as to reach to the commencement of jeopardy; while on the second occasion all were agreed that the question decided below was strictly preliminary and so in any event the correction of the error was within the scope of the power of superintending control. That left the court's conception of the full scope of its power as uncertain as before.

The last foregoing in advance of a general discussion seemed necessary in order to clear up apparent inconsistency between the result in the two instances mentioned, making it plain that the latter result was reached, logically, without any change of opinion on the part of any one participating in the first and without any purpose of declaring that the limits of the power involved were determinable either by the character of the question to be dealt with, as regards whether preliminary or not, or by the ancient scope of the writ of *mandamus,* which was used to put the power in operation.

Aiming in this opinion to tie closely to the decisions of this court, in the belief that they lead logically and unmistakably to the result reached, I can best commence by quoting the constitutional provision involved (sec. 3, art. VII), dividing the same, as significantly as practicable, into its component parts in harmony with numerous adjudications on the subject.

The supreme court, except in cases otherwise provided in this constitution,

(1) shall have appellate jurisdiction only, . . .

(2) shall have a general superintending control over all inferior courts; . . .

(3) and shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same.

In this connection I will place the provision of the constitution as to circuit courts in order that the distinction between the functions of the specifically named writs in one and the same in the other as repeatedly pointed out here, and as we shall call attention to hereafter, may be easily seen.

The circuit courts shall have original jurisdiction

(1) in all matters civil and criminal . . . not excepted, etc.,

(2) and appellate jurisdiction from all inferior courts and tribunals,

(3) and a supervisory control over the same . . . and "shall also have the power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and all other writs necessary to . . . give them a general control over inferior courts and jurisdictions."

At the first instance of the scope of the provision as to this court coming in question (*Att'y Gen. v. Blossom,* 1 Wis. 317), the opening clause was treated as a limitation and the second and third as separate and distinct grants of power. The writs specifically named in the second were held not to have been so named to afford instrumentalities for the exercise of the first grant of power, the power being ancillary to the latter, but to grant a distinct power of original jurisdiction co-extensive with the scope of the writs by the rules of the common law; that the first grant, as to its scope, is not dependent upon any or all the writs specifically named; that such writs, in their ordinary functions, are not appropriate at all to the exercise of supreme judicial superintending con-

trol over inferior courts. "It is barely possible," said the court, "that some one of them might be adapted to such a function in some specific case; but weighty, powerful, and imposing as such armor is, it is no more adapted to the exercise of a 'general superintending control over inferior courts' than would have been the spear of Goliath to the siege of Acre."

Discussing, in somewhat of a vein of ridicule, the idea that either of the specified writs within their ordinary field is at all suitable to the exercise of the power of superintending control, the court said:

"A *mandamus* cannot go to an inferior court to *control* its action. But it may be issued to put the court in motion. It may be called the moving, not the controlling, agency. A writ of injunction is in no way an appropriate means for exercising a superintending control over an inferior court. . . . It is usually directed to the parties, and not to the court."

In short, it was as definitely determined as any question could well be that the power in question is not limited by the ordinary scope of any one or all of the writs specifically mentioned in the constitution; that the constitutional idea was that the power should be exercised by common-law instrumentalities other than such specified writs, or by legislative means; that the writs were given not ancillary to any grant of power, but for jurisdiction of an original character, though no definite light was shed on the scope, in detail, of the great power under discussion, consistent with the court's conception of the constitution as to ultimate judicial authority. However, it was characterized as "unlimited in extent . . . undefined in character . . . unsupplied with means and instrumentalities." How comprehensive that conception is of the supreme authority to control litigation! How the power grows in one's appreciation as the subject is contemplated! How the idea is dwarfed into insignificance that the ancient functions of the writ of *mandamus* or in-

junction or *procedendo,* or all of them, suggest its bound-
aries, or that precedents, foreign or domestic, dealing with
what may or may not be technically so reached throw any
substantial light on the subject!

The court in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425,
511, dealing primarily with the subject of original jurisdic-
tion, followed without material variations the lines laid down
in the *Blossom Case.* The three quoted parts of the consti-
tution, appertaining to this court, were characterized as three
separate and entirely independent grants of power, instead
of, as before, one a limitation of power and the others grants.
of power, and since that time the latter treatment of the mat-
ter in this respect has been followed. It was said that the
second grant was given without any specific means for its.
exercise, but carried with it by necessary implication all com-
mon-law writs suitable thereto, and the power of invention
as to any new instrumentalities that might be necessary; that
the power was given to round out a single policy to construct
a supreme judicial tribunal over the whole state, a court of
last resort on all judicial questions under the constitution
and the laws of the state, to which was essential this power
of "superintending jurisdiction over all other courts *to con-
trol the course of ordinary litigation in them." Note the
significant words "to control the ordinary course of litiga-
tion,"* etc. It was pointed out that the specification of writs
common to the two quoted provisions was not made in the
same sense in each or for a common purpose. That as to
circuit courts the writs were given in aid of jurisdiction,
while as to this court they were given for jurisdiction. So
in the former their use is as general as is applicable to the
jurisdiction to which they are pertinent, while in the latter
they are limited to their ancient scope as prerogative writs
when used for prerogative purposes.

So it will be seen that the broad scope of the second grant
of jurisdiction to this court, as at first laid down, was in the

later case fully vindicated. Its broad and comprehensive character was emphasized at many points, the idea being made prominent that the instrumentalities for its exercise were to be discovered or invented, if need be, the power itself not to fail of efficiency in any given situation because of the ordinary restrictions upon the use of any particular writ or writs; that the constitutional grant was both "compact and congruous in itself," with its own "uniform group of analogous remedies" to be exercised in ways of its own "on many objects, in great variety of detail." The constitution, said the court, "wisely, almost necessarily, stopped with the general grants of jurisdiction, . . . and left details to practice and experience." It will be thus seen that such comprehensive generalization is but another way of stating, as was done before, that the power is "unlimited in extent," "undefined in character," and "unsupplied with instrumentalities." No suggestion is found up to this point that the concept of the constitution makers, as understood by this court, was based upon any model or any idea other than that to so round out supreme judicial authority as to afford a means in any given circumstances of preventing a denial of justice.

Intervening between the two cases above referred to is *State ex rel. Brownell v. McArthur,* 13 Wis. 407, and following them are *State ex rel. Att'y Gen. v. Circuit Court,* 97 Wis. 1, 72 N. W. 193, and *State ex rel. Spence v. Dick,* 103 Wis. 407, 79 N. W. 421. In neither was the scope of the power in question, nor the circumstances under which it should be used, discussed. However, in the first and third cases the error dealt with was strictly judicial and the remedy was allowed solely upon the ground that a clear statutory right had been inexcusably denied and there was no way of righting the wrong by appeal, while in the second case the error involved was jurisdictional and a summary remedy was demanded. So far as such cases throw any light on the subject in hand, an error of a trial court, whether judicial or

jurisdictional, seriously·prejudicing the rights of a party in ordinary litigation not remediable by any other efficient remedy, is within the field of the superintending control power of this court. Whether by legislative or judicial policy the exercise of the power may be restricted is a secondary question. The existence of the power does not militate against such power of restriction.

We now come to *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081. There for the first time the scope of the power and the proper instrumentalities for its exercise were called in question and the court, as it was then thought, defined the one and pointed out the other with sufficient clearness to render any further controversy in respect thereto unnecessary. The case has not since been disturbed at any point, and in all subsequent instances of the subject being presented here the controversy involved was treated as ruled by the former adjudication. There was no question in the *Johnson Case* but that the decision of the circuit court for Milwaukee county, which was challenged, was within the range of its judicial authority. The errors complained of were in respect to erroneously making several rulings denying statutory rights, all made judicially but injudiciously. By the proceedings instituted to remedy the mischief it was sought to compel a vacation of all orders interfering with the enjoyment of the rights so denied, to coerce the circuit court into retracing its steps, effacing all of the erroneous rulings from the record, and commencing anew at the point where the erroneous course of action commenced and into proceeding properly; and to fence the jurisdiction closely about as to what was the proper disposition of the controversy, and to reverse if necessary any action interfering with the offending court so retracing its steps.

At the threshold of the case it was insisted that the superintending control jurisdiction of this court was appropriate only for correction of jurisdictional errors and that the

function of the writ of *mandamus,* which was used, in any event, was only appropriate to reach such errors by setting the court in motion, upon the theory that the challenged rulings were usurpations and void. In deciding the case and granting the relief sought all that was said in the *Blossom Case (Att'y Gen. v. Blossom,* 1 Wis. 317) and the *Railroad Cases (Att'y Gen. v. Railroad Cos.* 35 Wis. 425) as to the general nature of the power of superintending control was referred to with approval. In addition to affirming the declaration that the power was given "without limitations," the court said, in the language of the Missouri court in *State ex rel. Bayha v. Philips,* 97 Mo. 331, 10 S. W. 855, conceiving that such court referred to errors of inferior jurisdictions not otherwise remediable than by an appeal to the supreme superintending power: "The control granted to the court in the particulars mentioned is fettered by no restriction or limitation; it is as broad as the exigency of the case demands." The language of the *Railroad Cases,* that the power was given to enable this court "to control the course of ordinary litigation in" all other courts, was repeated with emphasis. For the purpose of significantly picturing the concept of the framers of the constitution in conferring the power, it was said they had in mind that branch of supreme authority anciently exercised by the sovereign of England, through the instrumentality of his high court, to superintend "all inferior tribunals, . . . to enforce the due exercise of those judicial or ministerial powers, with which the crown or legislature has invested them; and this by not only restraining their excesses, but also by quickening their negligence, and obviating their denials of justice." Nothing was said militating against the declarations in previous cases as to the power not being measured by the field comprehended by the ancient use of any particular writ or collection of writs, though, with the grant of power, it was asserted, in harmony with the previous declarations, this court took, by necessary implica-

tion, all common-law writs applicable thereto.   But the early
suggestion here that the power was given without instru-
mentalities for its exercise, and the later one that in case of
incompetency of common-law writs to that end the court pos-
sessed, inherently, the power of invention, enabling it to
make new ones; the power referred to by Lord COKE as "a
secret in the law," and the early declaration that the writs
specifically mentioned in the constitution were wholly un-
suitable for vitalizing the power,—were expressly or im-
pliedly disfavored.   The writs of *certiorari, procedendo,*
and *mandamus* were declared to have been, under the Eng-
lish system, commonly used for the exercise of the superin-
tending control power, and in harmony therewith; that they
are the instrumentalities contemplated by the framers of the
constitution for the same purpose, and may be used with such
freedom as to satisfy all situations liable to arise.   The fact
that this court thus turned to the writs mentioned as the
proper instrumentalities, contrary to the logic of the *Blossom
Case,* does not mean the idea was entertained that in their
ancient scope they are the measure of the jurisdiction, but
rather that in any situation liable to arise one or the other
of such writs, the one being selected most suitable under all
the circumstances, may be used regardless of whether its an-
cient use needs expansion beyond its ordinary scope to meet
the case or not.   That is perfectly apparent from the use
there made of the writ of *mandamus* and is rendered unmis-
takable by this language:

"With the superintending control and the attendant writs
this court took all the power necessary to make that control
*and those writs effective,* and its arm is not nerveless because
no writ may be found in the form books so framed as to
meet the emergency.   *The writ will be framed to meet the
exigencies of the case,* and the court will discharge the duties
of the trust reposed with it by the people, *though it becomes
necessary to modify and enlarge the terms of the ancient
writ."*

We apprehend no one would seriously contend that the writ ordinarily used only to set in motion, to compel action, not to coerce judicial action in any particular way within the field of judicial judgment, without a radical expansion beyond that field could be used, as it was, to accomplish the result attained in that case and the companion case (*State ex rel. Fourth Nat. Bank v. Johnson,* 105 Wis. 164, 83 N. W. 320), where, as before indicated, the trial jurisdiction was coerced into vacating numerous orders, entered in the field of its authority by the injudicious exercise of power, and rules were laid down fencing such jurisdiction so closely about as to its future action in regard to the matter involved as to leave it very little to do rising above the dignity of a mere ministerial matter, and its order claimed to preclude its further action was in effect reversed.

A study of the court's opinion in the first *Johnson Case,* phrased by the present chief justice in his accustomed concise and clear language, satisfies the writer that a monumental work was there done for the administration of justice in this state. It defined clearly for the first time the nature of the great power lodged in this court. It laid the foundation for its administration so deep and made its import so supremely significant as to obviate any danger of the great trust reposed here not being carefully guarded and its lofty purposes fully vindicated. No other full exposition of the power and the manner of its exercise, so far as the writer can discover, can be found anywhere. The general effect of the case is that, as said in the beginning, the power is unlimited and undefined in the sense that it can have no limitation other than by the possibility of situations which may arise requiring its exercise to accomplish the ends of justice. The concept of the constitution makers, as suggested in the *Johnson Case,* was based on the unlimited authority of the English sovereign as exercised through his court, wherein, in contemplation of law, he was ever present to vindicate the

right upon the same being denied through the ignorance or the negligence or injudicious conduct of an inferior jurisdiction. It is not confined to the correction of jurisdictional errors of inferior jurisdictions, but extends not only to "restraining their excesses," but also to "quickening their negligence" and "obviating their denial of justice." That, we should say in passing, broadly viewed, includes the whole field of competency to err, whether judicially or jurisdictionally. The so-called "secret in the law" as regards inventing, judicially, new instrumentalities for the exercise of the power, is not recognized. Neither does the necessity for instrumentalities unknown to the common law exist.

By the foregoing full force is given to the remarks in the *Blossom Case* that the power in question was conferred with all the writs, instrumentalities, powers, and agencies provided by the common law for the convenient and complete exercise of it. But contrary to the treatment there of the competency of specified writs they are declared to be applicable to its exercise, especially in view of the inherent power of the court to adapt them to situations as they arise, by expansion if necessary, beyond their ancient scope. I suggest in passing that this power of expansion is probably all there is of the so-called "secret in the law" to make new writs; that the expansion of the scope of an old writ, though no new name is coined to characterize it, is, in effect, for the given case, the making of a new writ. The court is, therefore, fully equipped with all the essentials for the convenient and complete exercise of the power of superintending control. Thus the *Johnson Case* left nothing further for future consideration as to fundamentals or details, and unless something has been since decided out of harmony therewith the case in hand clearly falls within the broad scope of that power.

In the second *Johnson Case* it was said that this court under its superintending control power may act upon an in-

ferior court where otherwise valuable rights would be denied "by refusal of such court to exercise or keep or act judicially within its jurisdiction." It is "a power to be used only where there is no other remedy under our judicial system that will meet the situation and prevent irreparable mischief, when that mischief springs from something other than mere error of judgment." That viewed independently of the situation dealt with would suggest that the superintending control power has to do only with jurisdictional error. But, plainly, it is thought, the case then in hand was being characterized without thought of stating a rule of limitation. Again, the term "act judicially," as applied to the facts, was inadvertently used for the term "act judiciously." There, was no usurpation involved. Everything done which was challenged, though palpably erroneous, was honestly done and binding on all persons concerned until vacated by or at the command of some higher authority.

With the broad lines laid down in the *Johnson Case* in view the court said in *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 237, 82 N. W. 158, 162, speaking of the *Johnson Case:*

'This court decided summary and radical action essential to recall the circuit court from a wholly erroneous policy. . . . It is urged, though the inferior courts be acting within their jurisdiction and exercising merely the judicial powers with which they are vested, this court should interfere to 'control the course of ordinary litigation in such inferior courts,' 'not only by restraining their excesses, but by quickening their negligence and obviating their denial of justice.' That such power is vested in this court cannot be denied, nor that from such power results a duty to exercise it fearlessly and unflinchingly in a proper case." Page 234 (82 N. W. 161).

In *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 512, 107 N. W. 500, 514, the idea expressed in the *Johnson Case* that the "secret in the law" spoken of in

the *Railroad Cases,* as to the inherent power of this court to invent new writs, is too mythical for safe judicial anchorage, was emphasized by the suggestion that the "so-called secret has slept so long as to raise doubts as to whether the framers of the constitution had in mind . . . writs not specifically mentioned other than those then known." All that was said in the *Johnson Case* as to the feasibility of fully vitalizing the power of superintending control by the well-known common-law writs was affirmed and the scope of the jurisdiction as well, but in an attempt to appropriately subdivide the field covered by it and suggest the particular instrumentalities appropriate to each group of circumstances, language was used which, considered apart from the case itself, might well lead to the belief that the scope of superintending power does not extend so far as here indicated to have been established in the *Johnson Case.* But the opinion, as a whole, it seems, shows to the contrary. It was said, in effect, that the power includes (1) the prevention of usurpation by inferior courts, the superintending jurisdiction acting prohibitively; (2) the quickening of judicial action in case of unreasonable delay, setting the same in motion in case of refusal to act and compelling action within the limits of jurisdiction in case of inexcusable excursions beyond the same; (3) the reversal of determinations void for jurisdictional error. A fourth subdivision should have been added, in harmony with the *Johnson Case,* viz., and, generally, to "obviate denials of justice." This last is of the utmost importance. Without it the field cannot be covered. It was not in fact supposed in the classification that the whole subject was comprehended. It was said the outlines of the great power of superintending control mark the boundaries as definitely as they can well be, except by the application of principles to cases as they arise. Experience will demonstrate that, when the right is claimed, superintending control will reach far enough to suit the necessities of the case.

It should be noted that in the *Chittenden Case* the court, or at least the writer in speaking for the court, did not for the time fully appreciate how distinctly the idea of the *Blossom Case,* that the writs commonly used to make the power of superintending control effective are inappropriate thereto, and the affirmance in the *Railroad Cases* that the court possessed some inherent power of invention to enable it to supplement by new writs common-law instrumentalities in case of necessity, had been, subsequent to the *Johnson Case,* recognized as disapproved therein. In *Deuster v. Zillmer,* 119 Wis. 402, 97 N. W. 31, the court, speaking by the present chief justice, declared that "This power of superintending control is to be exercised by the established writs of the common law, at least until the legislature shall provide additional or other means." That is fully justified by the opinion in the former case, as we have seen, and is grounded thereon. It justified the practical denial of the suggested power of invention as to new writs made in the subsequent case.

The foregoing, without referring to other cases which are in harmony therewith, brings the subject under discussion down to date, leaving the first *Johnson Case* as the judicial classic, fully exposing to view the power of superintending control in its fundamentals and details. It has not been, as we have seen, by anything said subsequent thereto and is not liable to be in the future, departed from. The first *Williams Case* (130 Wis. 588, 110 N. W. 1135), it must be said, was a departure to the extent that, *ex necessitate legis,* the court was unable to act. The second *Williams Case (ante,* p. 1, 116 N. W. 225), is in harmony or out of harmony according to one's viewpoint, with the failure to act in the first. So far as it goes, it approves the declarations in the *Johnson Case* without limitation, except as it may be read as suggesting that the ordinary scope of the writs used in the numerous cases cited, particularly the English cases, indi-

cates the limits of the power of "superintending control."
While that may appear to the casual reader to have been the
court's conception of the matter, it was not such in fact, so
far as I am aware. The case, of course, was rightly decided,
tested by the law of the *Johnson Case,* and the use of the
superintending power in the particular instance was fully
vindicated upon principle and authority by the forceful
treatment of the matter by Mr. Justice DODGE, speaking for
the court.

The history we have given leaves nothing to be said to fur-
ther define the superintending power. The ancient charac-
terization, as we have seen, marks the boundaries, reaching
out as far as possible wrongs to be righted for which no other
efficient remedy would exist, it being understood that no sit-
uation is cognizable, judicially, as involving a wrong, which
has been finally judicially closed, so far as the policy of the
law designs to furnish a remedy at all. It is difficult to imag-
ine a judicial or jurisdictional error not involving either ex-
cessive exercise of power or negligent exercise thereof or de-
nial of justice.

The case in hand, if we assume the trial court's decision
to have been wrong, does not involve any jurisdictional error
nor a mere preliminary question, if such are to be limited to
those arising prior to entering upon the merits of the charge
either in reference to the sufficiency of the indictment or the
proof to sustain it, but, upon the hypothesis suggested, does
involve a denial of justice, presents a case of guilt within
reasonable probability and the doors of justice erroneously
closed by the trial court and the offender immune and the
people remediless.

We now come to the secondary question of whether the
court ought to allow its superintending authority to be used
in the given case. It by no means follows that, given a
wrong within the field of the power, that power should be
used as a matter of course to remedy it. The scope of the

power is one thing, the condition under which it should be exercised is another.    The former is referable to the constitutional grant, the latter to the sound discretion of this court. For a firm entrenchment of that doctrine in the jurisprudence of this state, we need only turn again to the first *Johnson Case.*    The conclusion was there most considerately reached and declared that the rule early established and consistently adhered to as to the exercise of the court's original jurisdiction should be applied to the power of superintending control.    Under that rule, as we have before suggested, to invoke the jurisdiction is to appeal to the sound discretion of the court.    *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497.    So a firm stand was taken against the free use of the superintending power which prevails in some jurisdictions, and notably in that of Michigan, the court declaring that the power was committed "to the court by the people" as a sacred charge *"not to be exercised upon light occasions* or when other remedies are sufficient."    The errors there involved were reviewable on appeal, but, under the peculiar circumstances existing, not so as to save the valuable rights of many persons, which were in jeopardy.    Such circumstances were of the most extraordinary character that could be imagined, both in respect to the magnitude and number of interests involved and the inexcusable though honest course of their treatment.    No counterpart thereto can be found in the history of litigation contained in our reports.    It is aptly characterized to that effect in *State ex rel. Milwaukee v. Ludwig,* 106 Wis. 226, 236, 237, 82 N. W. 158, 162. These essentials to a situation warranting the use of the superintending power were there restated from the *Johnson Case:*

"The duty of the court must be plain, the refusal to proceed within its jurisdiction to perform that duty must be clear, the results of such refusal prejudicial, the remedy, if any, by appeal or writ of error utterly inadequate, and the application for relief by *mandamus* speedy and prompt."

That was emphasized anew by reference to the very few instances in which the power had been exercised in more than half a century of the court's history, in each of which instances the right involved was clear and hardship of a most serious nature to possessors of private interests was shown, for which there was no remedy at all, or none which was efficient, other than by the use of this extraordinary power. The general idea expressed is that in all ordinary cases, especially of error committed in the field of reasonable judgment and not strictly jurisdictional, parties should be left to such assistance as usual remedies afford them; that it has not been and will not and should not be the policy of this court to use its "superintending control power" to interfere with the results of litigation in inferior courts merely because, upon careful consideration thereof, it may appear that such results were wrong.    Many illustrations were given to which others might be added, as for instances in *State ex rel. Brownell v. McArthur,* 13 Wis. 407; *State ex rel. Spence v. Dick,* 103 Wis. 407, 79 N. W. 421; and the two *Johnson Cases,* the errors, though judicial in character, were so palpable as not to evince any fair exercise of judgment.    They were akin, at least, to usurpation, especially in the first two cases, while the magnitude of the issues jeopardized in the latter, as before indicated, was exceptional to a high degree. To the same effect are *State ex rel. Meggett v. O'Neill,* 104 Wis. 227, 80 N. W. 447; *State ex rel. Fuller v. Circuit Court,* 108 Wis. 77, 83 N. W. 1115; *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 87 N. W. 1107; *In re Mielke,* 120 Wis. 501, 503, 98 N. W. 245; *State ex rel. McGovern v. Williams, ante,* p. 1, 116 N. W. 225.

Cases involving a clear denial of a statutory right, whether by the commission of judicial or jurisdictional errors not remediable by appeal or otherwise than under the superintending control power, must be recognized as forming a class by itself.    *State ex rel. Brownell v. McArthur, supra;*

*State ex rel. Spence v. Dick, supra; State ex rel. Watson v. Clementson,* 133 Wis. 458, 113 N. W. 667.   The general policy was thus concisely stated in *State ex rel. Tewalt v. Pollard, supra:*

"This court will not exercise its jurisdiction when there is another adequate remedy, by appeal or otherwise, nor unless the exigency is of such an extreme nature as obviously to justify and demand the interposition of the extraordinary superintending power."

With the foregoing in view it seems plain that the difficulties claimed to exist here come very far from involving such an emergency as the adjudications suggest to be necessary for putting the power in question in motion, notwithstanding there is no opportunity for relief by the use of ordinary remedies.   The alleged error is not jurisdictional in any sense.   It is not of a serious nor far-reaching character.   It may well be characterized as quite insignificant.   It concerns only an alleged breach of a mere police interference with private conduct, not involving moral turpitude nor inflicting, in the given case, any injury upon any one.   The incident challenged, we may well assume, was but one of many affording ample opportunity for one or more prosecutions of the accused independently of the event in question. As to that the claimed infirmities in the information can probably be remedied.   The validity of the law itself is not involved.   A new prosecution for the same offense, even, can be commenced if sec. 4611, Stats. (1898), be valid, and it has never yet been challenged.   No other pending prosecution in the same or any other jurisdiction, so far as appears, will be directly or indirectly affected by the alleged wrong decision.   It is not binding and will not necessarily have any efficient influence as to other cases in any other jurisdiction.   In short, it is truly of a trifling character, within the meaning of the declarations here that the court will not take cognizance under its superintending power of

such matters. To depart therefrom in this case would be to start on a policy of as free use of the superintending power as is customary in some other jurisdictions, which, as declared in the *Johnson Case,* this court is not inclined to do.

In the foregoing I am conscious of having traversed ground covered in the able opinion written for the court, but it seemed necessary in order to carry out the full purpose of this opinion, to pursue as logically as I could a history of the subject from the beginning to the crystallization of the doctrine I understand to have been heretofore and to be now substantially declared. I will close the treatment with this brief recapitulation:

(1) The second constitutional grant of power to this court, that of "general superintending control over all inferior courts," is not limited other than by the necessities of justice. It extends to judicial as well as jurisdictional errors.

(2) The necessities of justice, in a legal sense, do not reach beyond the scope of governmental policy as to righting wrongs by judicial interference; as for example, it stops in criminal cases at the constitutional prohibition of a second jeopardy.

(3) The grant of superintending control, though without specified means or instrumentalities for its exercise, includes, by necessary implication, all common-law writs and means applicable thereto and all power necessary to make such writs and means fully adaptable for the purpose.

(4) The extent of the power of superintending control, as to any particular group of circumstances, is not measurable by that of the common-law writ most adaptable in its ordinary scope to vitalize such power in regard to such circumstances. Such extent is referable to the necessities of the case and the ordinary-use feature of the writ is to be expanded to meet the exigencies thereof.

(5) The common-law writs with the power indicated to adapt them leave no part of the court's superintending con-

trol power to be necessarily dormant for want of means to vitalize it.

(6) The existence of error in the field of the controlling power does not, necessarily, upon proper request in form, require the doors of the jurisdiction to open. When that should occur rests in sound judicial discretion.

(7) By the policy of this court its superintending control power is to be exercised only when the right of the matter involved is plain, there is no other efficient remedy for its invasion or denial, such invasion or denial is prejudicial, and, generally, and especially as to errors not strictly jurisdictional, the case presents circumstances of exceptional or extraordinary hardship.

The following opinion was filed November 5, 1908:

WINSLOW, C. J. (concurring). When an English inferior court had for some reason dismissed a cause and application was made to the court of King's Bench to exercise its power of superintending control by the writ of *mandamus* directing the inferior court to proceed to a trial of the cause, this test was applied: Has the court refused to proceed further because it wrongly decided that some jurisdictional or other purely preliminary objection, such as lack of proper parties, prevented it from entertaining the controversy at all, or has it decided that the facts stated constitute no offense or cause of action? In the first case the writ would be issued, in the second case it would not, because in the first case the court had declined to exercise its jurisdiction to try the case, while in the second case it had exercised jurisdiction and tried the merit. of the case upon an issue of law. *Reg. v. Brown,* 7 E. & B. 757; *State v. Williams, ante,* p. 1, 116 N. W. 225, and cases cited in opinion. When the present case was brought before us I thought, and still think, that it presented, not a case of dismissal upon a preliminary

question without trial, but a case where the court upon de-
murrer had determined the merits of the case as set forth in
the information; or, in other words, had tried the case upon
an issue of law. If, therefore, the English rule were to be
applied, it seems to me that the writ must be denied.

I was also of opinion that the English rule should be ap-
plied, as it seemed to me that we had definitely held in the
*Johnson Case* (103 Wis. 591, 79 N. W. 1081; 105 Wis. 164,
83 N. W. 320) that the constitutional grant of the power of
superintending control to this court meant only such power
as was exercised by the court of King's Bench. The ma-
jority of my brethren, however, hold that, even if my view of
the English rule be correct (which they do not concede), still
this court in the first *Johnson Case* took a much broader
ground, and decided, in effect, that in a proper case this court
would not only review by *mandamus* the action of an inferior
court upon such a preliminary question, but would review
any ruling which resulted in the practical throwing of a case
out of court before trial upon evidence, which, as applied to
criminal cases, would mean any ruling resulting in dismissal
prior to the impaneling of a jury and the placing of the de-
fendant in jeopardy. Upon mature reflection and with some
hesitation I have yielded to this view, not because I have be-
come convinced of error in my first conclusion, but chiefly
because it has seemed to me eminently desirable that a trou-
blesome question which has been frequently presented to us
of late should be definitely and clearly settled with as great
unanimity as possible.

I agree also with the conclusion reached by the court that
the facts here do not present a case of such importance as
should move this court to' action. In the *Johnson Case* it
was substantially held that the power of superintending con-
trol was not given to this court to be exercised indiscrim-
inately in trivial or relatively unimportant causes, but only
upon *sufficient* occasion. That was a case where large prop-

erty interests were at stake and the rights of many persons involved, and it was deemed that it was of such importance that this court should interfere. So in the *Williams Case, supra,* the question presented involved the validity of a large number of other prosecutions which would fail and become outlawed if the ruling of the trial court were not reversed. It is true that this limitation upon our exercise of the power of superintending control has not always been clearly recognized, but it is equally true that it must be recognized or the writ of *mandamus* will be turned practically into a writ of error by which every insignificant prosecution which for some reason is thrown out of court before trial on evidence may be brought to this court for review. The volume of business which would thus be added to the heavily burdened calendars of this court cannot be definitely estimated, but it would doubtless be great. It is not to be supposed that the constitution conferred the power of superintending control on this court to be used as a sort of an addition to the ordinary appellate jurisdiction in ordinary litigation, but rather as an extraordinary power to be wisely used only in cases where there has been a miscarriage of justice involving important public rights or great and widely extended private interests.

The following opinion was filed November 10, 1908:

DODGE, J. (*concurring*). The power of superintending control conferred on this court by our constitution is coterminous with the power vested in the court of King's Bench. *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081; *State ex rel. McGovern v. Williams, ante,* p. 1, 116 N. W. 225. It extended to a review of preliminary questions needing to be decided before the court could take into consideration the merits of the controversy. *State ex rel. McGovern v. Williams, supra,* and English cases cited. The question in the *Williams Case* was whether there existed

any indictment so that the court might proceed to consider whether the accused was guilty of the asserted crime. Here the question is whether, conceding the existence of an indictment, the facts therein charged against defendant constitute guilt of the crime asserted. Such question was excluded from the superintending jurisdiction of the court of King's Bench. *Ex parte Lewis,* L. R. 21 Q. B. Div. 191; *Reg. v. Dayman,* 7 E. & B. 672; *Rex v. Justices,* 1 M. & S. 190. The review of such a question belongs within the appellate power and jurisdiction. Original jurisdiction to try the merits of a criminal charge is vested in other courts and cannot properly be conferred on, or assumed by, this court. *Seiler v. State,* 112 Wis. 293, 87 N. W. 1072. The merits include both questions of fact and law: First, did the accused perform the acts charged against him; and, if so, secondly, did he thereby commit a crime? The impossibility of designating the latter question a preliminary one is obvious, for it may be considered at any stage in the trial, as well after verdict in arrest of sentence or on motion to direct verdict as on demurrer or motion to quash before the jury is sworn. The impropriety of decision upon it by this court in the exercise of its superintending control, by *mandamus* or other writ running to the inferior court, is very obvious, because of its futility. In such a proceeding the accused is not a party, and the expression of views by this court cannot become *res adjudicata* in the action against him. Our mandate on such a writ can only command the trial court to perform its judicial duty to proceed to try the case. When that is done the circuit court owes the accused the duty to decide all questions according to his own best judgment, and the question whether the acts charged in the indictment constitute a crime is one that the defendant has a right to demand shall be decided by the circuit court honestly. He may consider our views and repudiate them. This court should never be called on to act where its decision is merely advisory. *Reg.*

*v. Dayman, supra.* To entertain a question on the merits and express our views upon it in the hope that the trial court would pay deference to them would be in practical effect to exert an appellate jurisdiction by subterfuge, especially where under the constitution and laws we have none. There both parties have a right that their controversy be finally settled according to the judgment of the lower court. It is a very debatable question whether the delays and other perils attending review by this court of the merits of a criminal charge when the circuit court has decided them in favor of the accused are not fraught with so much of danger to the public welfare and of oppression to individuals as to overcome any possible harm likely to result from finality of the circuit court's decision. And when the legislature resolves that question of public policy against such review, I do not think we perform our constitutional duty to the co-ordinate branch of government when we exercise review in defiance thereof professedly under the power of superintending control, when clearly that power as granted by the constitution, as always construed by this court, does not include the authority to review the merits.

For these reasons, while I concur in the judgment of the court in dismissing the writ in the present case, I cannot yield my assent to that portion of the opinion which declares that under some other circumstances we should have power to review such an order as this.